256 So.2d 594

**STATE of Louisiana**

v.

**Dan E. DOTSON.**

No. 50828.

March 29, 1971.

On Rehearing Dec. 13, 1971.

Further Rehearing Denied Jan. 17, 1972.

Henry Newton Brown, Jr., Bossier City, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., Harry H. Howard, Asst. Atty. Gen., John B. Benton, Jr., Dist. Atty., Rogers M. Prest-

ridge, Asst. Dist. Atty., for plaintiff-appellee.

Jack P. F. Gremillion, Atty. Gen. (Harry H. Howard, Asst. Atty. Gen., Louise Korns, Asst. Dist. Atty., Parish of Orleans, John A. Richardson, Dist. Atty., 1st JDC, Hal R. Henderson, Dist. Atty., 2nd JDC, Ragan D. Madden, Dist. Atty., 3rd JDC, Robert W. Kostelka, Dist. Atty., 4th JDC, E. Rudolph McIntyre, Dist. Atty., 5th JDC, Thompson L. Clarke, Dist. Atty., 6th JDC, W. C. Falkenheiner, Dist. Atty., 7th JDC, Sam L. Wells, Dist. Atty., 8th JDC, Edwin O. Ware, Dist. Atty., 9th JDC, Ronald C. Martin, Dist. Atty., 10th JDC, J. Reuel Boone, Dist. Atty., 11th JDC, Charles A. Riddle, Jr., Dist. Atty., 12th JDC, L. O. Fusilier, Dist. Atty., 13th JDC, Frank T. Salter, Jr., Dist. Atty., 14th JDC, Bertrand DeBlanc, Dist. Atty., 15th JDC, Knowles M. Tucker, Dist. Atty., 16th JDC, Wilmore J. Broussard, Jr., Dist. Atty., 17th JDC, Samuel C. Cashio, Dist. Atty., 18th JDC, Sargent Pitcher, Jr., Dist. Atty., 19th JDC, Richard H. Kilbourne, Dist. Atty., 20th JDC, Leonard E. Yokum, Dist. Atty., 21st JDC, Woodrow W. Irwin, Dist. Atty., 22nd JDC, Aubert D. Talbot, Dist. Atty., 23rd JDC, Frank H. Langridge, Dist. Atty., 24th JDC, Leander H. Perez, Jr., Dist. Atty., 25th JDC, John B. Benton, Jr., Dist. Atty., 26th JDC, J. Y. Fontenot, Dist. Atty., 27th JDC, Holmes Mouser, Dist. Atty., 28th JDC, Melvin P. Barre, Dist. Atty., 29th JDC, William C. Pegues, III, Dist. Atty., 30th JDC, Bernard N. Marcantel, Dist. Atty., 31st JDC, Alfred R. Ryder, Dist. Atty., 33rd JDC, Jim Garrison, Dist. Atty., Orleans Parish, of counsel), join in the issue of disclosure of informer's identity in Bill of Exception No. 2.

DIXON, Justice.

On November 22, 1969 defendant Dan E. Dotson was a passenger in a green automobile traveling from Shreveport to Bossier City. Lt. Bolton of the Bossier City Police Department received a telephone call from a confidential informer advising that the occupants of a green automobile, traveling to Bossier City by a specified route, possessed narcotics.

Lt. Bolton proceeded to the Shreveport-Barksdale Bridge and radioed for additional police vehicles. When the suspect car crossed the bridge, Lt. Bolton, aided by the other police vehicles, stopped the car and ordered its occupants out. No search was conducted then. However, the occupants, including defendant, were arrested for possession of narcotics.

Lt. Bolton took defendant, along with the driver of the suspect vehicle, into police headquarters. Another officer drove the suspect vehicle in. The driver of the green vehicle consented to a search of his car, which revealed no narcotics therein. However, the driver was charged with having a defective muffler.

Lt. Bolton attempted to question defendant, but Dotson refused to waive his right to remain silent. Lt. Bolton then filled out an affidavit and, based on this affidavit, a search warrant was issued by the judge of the city court of the city of Bossier City. Lt. Bolton then searched the person of defendant and took from defendant's clothing a matchbox allegedly containing marijuana. Defendant was charged with possession of narcotics.

Defendant filed a motion to suppress, which was overruled. At his trial, defendant asserted his innocence and claimed that he had been "framed." The jury found the defendant guilty of possession of narcotics, as charged. This appeal was taken.

Defendant alleges five errors of law, corresponding to his five bills of exceptions: (1) failure to suppress evidence taken from the person of defendant; (2) failure to disclose the name of the confidential informant; (3) introduction of evidence which had not been identified properly nor shown to be in substantially the same condition as at the time of the alleged criminal transaction; (4) questioning defendant concerning prior misconduct and introduction of testimony referring to a prior arrest; and (5) outside association of a juryman with the primary state witness whose credibility was at issue. These specifications will be treated in order.

Bill of Exception No. 1 was reserved when the trial court overruled defendant's motion to suppress evidence taken from his person. The police stopped the car, arrested defendant, later obtained a search warrant, and then proceeded to search the person of defendant, all on the basis of a telephone call from an undisclosed informant. The essential question presented by the motion to suppress was whether the police had probable cause either to obtain the search warrant or to conduct the search without a warrant. Anent the validity of the procedure used, the United States Supreme Court has spoken. Said the Court in Aguilar v. Texas:

"Here the 'mere conclusion' that petitioner possessed narcotics was not even that of the affiant himself; it was that of an unidentified informant. The affidavit here not only 'contains no affirmative allegation that the affiant spoke with personal knowledge of the matters contained therein,' it does not even contain an 'affirmative allegation' that the affiant's unidentified source 'spoke with personal knowledge.' For all that appears, the source here merely suspected, believed or concluded that there were narcotics in petitioner's possession. The magistrate here certainly could not 'judge for himself the persuasiveness of the facts relied on * * * to show probable cause.' He necessarily accepted 'without question' the inform-

ant's 'suspicion,' 'belief' or 'mere conclusion.'

"Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, see Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887, was 'credible' or his information 'reliable.' Otherwise, 'the inferences from the facts which lead to the complaint' will be drawn not 'by a neutral and detached magistrate,' as the Constitution requires, but instead, by a police officer 'engaged in the often competitive enterprise of ferreting out crime,' Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 * * *; Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436, * * *, or, as in this case, by an unidentified informant.

"We conclude, therefore, that the search warrant should not have been issued because the affidavit did not provide a sufficient basis for a finding of probable cause and that the evidence obtained as a result of the search warrant was inadmissible in petitioner's trial.

"The judgment of the Texas Court of Criminal Appeals is reversed and the case remanded for proceedings not inconsistent with this opinion." Aguilar v. Texas, 378 U.S. 108, 113–116, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) (footnotes omitted).

In a Louisiana case, State v. Wells, Justice Hamiter of the Supreme Court of Louisiana wrote:

"Under the rulings of the United States Supreme Court in Nathanson v. United States, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 and Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, such an affidavit, based on mere affirmance of belief or suspicion, is patently defective and, therefore, the warrant issued pursuant thereto is illegal and invalid.

"But even aside from these rulings the same result would be reached under the express language of Article 162 of our own Code of Criminal Procedure which pertinently provides:

" 'A search warrant may issue only upon probable cause *established to the satisfaction of the judge, by the affidavit of a credible person, reciting facts establishing the cause for issuance of the warrant.*' " State v. Wells, 253 La. 925, 221 So.2d 50, 52 (1969) (emphasis in original).

In the instant case, the affidavit of Lt. Bolton demonstrated why the informant was considered reliable but did not recite any of the underlying facts upon which the informant based his suspicion. The judge issued the search warrant in this case without knowing whether the informer's telephoned statement was based upon rumor, hearsay or personal observation. Clearly, the warrant was invalid. The prosecution, however, argues that there was probable cause to support the search without a warrant. Normally, a higher degree of probable cause is necessary to support a warrantless search than to support a search with a warrant. Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). However, in the case at bar, even though Lt. Bolton may have omitted from his affidavit a recitation of the underlying facts upon which the informant based his suspicion, Lt. Bolton himself knew those underlying facts. Accordingly, the *arrest* was lawful.

"As a general rule, a search is unreasonable if it is not conducted under the authority of a search warrant. However, the rule is subject to the important exception that a search may be reasonably made as an incident of a lawful arrest.

"In the present case, the police officers concede that they had no search warrant authorizing them to search the defendant's home. Hence, to justify the forcible intrusion into his residence, it must be established that the search was incident to a lawful arrest. Presented to us for resolution are two questions: Was the arrest lawful? If so, was the search of defendant's residence incidental to it?" State v. James, 246 La. 1033, 169 So.2d 89 (1964).

To answer the second question above presented, the search of defendant certainly would have been "incident" to the arrest had it been made immediately following that arrest. However, the fact that the search was conducted at the police station rather than at the point of arrest does not suggest that the search was not "incident" to the arrest.

In Recznik v. City of Lorain, the United States Supreme Court stated:

"We have held that the prosecution has not met its burden when an arresting officer 'said no more than that someone (he did not say who) had told him something (he did not say what) about the petitioner.' Beck v. [State of] Ohio, 379 U.S. 89, 97, 85 S.Ct. 223, 228, 13 L.Ed.2d 142. Even where a search warrant is obtained, the police must show a basis for the search beyond the mere fact of an assertion by an informer. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723. At least as much is required to support a search without a warrant." Recznik v. City of Lorain, 393 U.S. 166, 169, 170, 89 S.Ct. 342, 345, 21 L.Ed.2d 317, 321 (1968).

In the instant case the arresting officer did say what the informer had told him. Here the arrest was lawful and the search was incident thereto.

Accordingly, this court must hold that Bill of Exception No. 1 is without merit.

Bill of Exception No. 2 was reserved at the trial when the court refused to permit defendant to obtain the name, by cross-examination of Lt. Bolton, of the person who informed on him by telephone. The jury was retired, and the defense attorney then stated into the record:

"The defendant will allege that the stuff that was found on him, marijuana, was planted there by the informant. And as a direct part of his defense, it will be necessary to place this informer on the stand and attack his credibility and attack whether or not he did in fact, plant the stuff on him. I think this is an exception to the disclosure rule."

Although the identity of the informer was well known to Lt. Bolton, the court ruled adversely to defendant. Exception was reserved; the jury was returned; the trial resumed.

While it has been held that the police normally are privileged to withhold from an accused the identity of an informer, this privilege is not absolute. The general rule has its exceptions. In the instant case, one of defendant's contentions on trial was that he had been "framed"

and that someone had planted the marijuana on his person. Under such circumstances, the defendant was entitled to the name of the informer. The trial judge cited in his per curiam the case of State v. Pagnotta. However, that case readily is distinguishable from the case at bar; indeed, Pagnotta is persuasive authority for defendant Dotson. In Pagnotta, Justice Hamlin of this court found correct the following proposition expressed in the per curiam of Pagnotta's trial judge:

"'This Court has held on occasions too numerous to mention that the defendant is not entitled in a situation such as this, the name of the informant. There was to [no] allegation here by the defendant through his counsel or through any testimony that the confidential informant had framed him or had planted the evidence in his apartment, or had done any other act which would require revealing his identity. * * *'" State v. Pagnotta, 253 La. 770, 220 So.2d 69, 72 (1969).

In the instant case, of course, the requisite allegation was made that the confidential informant had framed the defendant. Directly in point is the United States Supreme Court case of Roviaro v. United States, in which Mr. Justice Burton wrote:

"Petitioner contends that the trial court erred in upholding the right of the Government to withhold the identity of John Doe. He argues that Doe was an active participant in the illegal activity charged

and that, therefore, the Government could not withhold his identity, his whereabouts, and whether he was alive or dead at the time of trial. * * *

"What is usually referred to as the informer's privilege is in reality the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law * * * The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

" * * * Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action. Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a search warrant is in issue and the communications of an informer are claimed to establish

probable cause. In these cases the Government has been required to disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication." Roviaro v. United States, 353 U.S. 53, 59–61, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957) (footnotes omitted).

Accordingly, under the circumstances of this particular case, this court must hold that Bill of Exception No. 2 was well taken, and that the trial court should have permitted defendant to learn the name of the informer in order that the informer might be examined concerning the alleged "planting" of the evidence.

Bill of Exception No. 3 was reserved when the State introduced the alleged marijuana as an exhibit without identifying the matchbox as being the same matchbox that was taken from the defendant following his arrest, and further without establishing a chain of evidence. Neither Lt. Bolton nor Detective Almond ever identified the matchbox produced in court as being the same matchbox that was taken from defendant following his arrest. No one ever said, "This is the matchbox we took from the defendant." Additionally, it is clear from the evidence that the matchbox that was in fact removed from the person of defendant was sent to Baton Rouge for laboratory analysis and there was handled by persons unknown. The technician, known to the State by way of

her report, never was called to testify concerning what she did with the exhibit. Defendant suggests that the cannabis could have been put into the box during a clinical examination of its contents. There is no chain of evidence to negate this possibility.

Of particular interest is the case of State v. Foret, in which Chief Justice O'Niell of the Louisiana Supreme Court wrote:

"The judge, according to his per curiam, rested his ruling largely upon the fact that Templet, in his testimony, gave a detailed description of the steer which he said was missing from his pasture and was found several months afterwards in the neighboring pasture of the defendant, and was taken by the sheriff and delivered to Templet. But that testimony did not supply the omission of the prosecuting attorney to offer testimonial proof that the steer which was in the truck, and which was inspected by the jury, was the same steer that was taken from the defendant's pasture by the sheriff and delivered to Templet. Without some such proof of the identity of the steer in the truck he was not admissible in evidence; and the judge should have complied with the request of the attorneys for the defendant to instruct the jurors to disregard any impression that they might have received from their inspection of the steer in the truck." State v. Foret, 196 La. 675, 200 So. 1, 3 (1941).

Accordingly, this court must hold that Bill of Exception No. 3 was well taken, and that the trial court should not have permitted the introduction into evidence of the matchbox and its contents absent the establishment of a proper chain of evidence.

Bill of Exception No. 4 was reserved when the State, over defense objection, was permitted to interrogate defendant about prior possession of marijuana, and when the prosecution's chief witness was permitted to testify that on a previous occasion he had arrested defendant for possession of marijuana. Evidence of the prior possession, of course, is admissible *for the purpose of showing guilty knowledge or intent*. Louisiana Revised Statutes 15:445, 446. In the instant case, it now is claimed in this court by the present district attorney that the information in fact was elicited for the legitimate purpose of showing guilty knowledge or intent, rather than for the purpose of impeachment. However, a reading of the transcript discloses that the former district attorney who handled the case in the trial court did not mention the alleged prior possession in his opening statement. Rather, he stated during the trial: "I'm simply laying the foundation for the impeachment of—." The jury then was retired. Defense counsel asked: "Is the District Attorney attempting to introduce evidence of a prior

arrest or conviction of the defendant?" The district attorney replied: "I have no such intention." In the presence of the jury, the district attorney then asked the defendant: "You deny that on the 28th day of August, 1969, you actually used marijuana? At this address that I—." "Do you deny that other people there used it?" Later, when Lt. Bolton again took the stand, the district attorney questioned the officer as follows:

"Q. Mr. Bolton, you have previously testified that you knew Danny Dotson on sight."

"A. Yes sir.

"Q. On the 22nd of November. He has testified that you have had previous contact with him. Is this correct?

"A. Yes sir I have. When I arrested him—."

The lieutenant then was allowed to testify that on a previous occasion Danny Dotson was in a house where others may have been using marijuana. Defendant never was convicted of the alleged prior possession.

Louisiana Revised Statutes 15:495 provides:

"Evidence of conviction of crime, but not of arrest, indictment or prosecution, is admissible for the purpose of impeaching the credibility of the witness, * * *; and no witness, whether he be defendant or not, can be asked on cross-examination whether or not he has ever been indicted or arrested, and can only be questioned as to conviction, and as provided herein."

See also Comment, Admissibility of Evidence of Prior Arrests in Louisiana Criminal Trials, 19 La.L.Rev. 684 (1959). This court has no alternative other than to hold that Lt. Bolton's testimony that he had arrested defendant for possession of marijuana on a previous occasion was highly prejudicial for the jury, and accordingly that Bill of Exception No. 4 was well taken.

Bill of Exception No. 5 was reserved after lunch on the day of trial, when the trial court denied defendant's motion for a mistrial. It is undisputed that the State's main witnesses ate lunch that day at the same table with one of the jurors. The prosecution argues that the Village of Benton has just one restaurant, and that there is no evidence in the record that the policemen discussed the case with the juror during lunch.

While there is no rule applicable to the circumstances instant that would have precluded the witnesses from eating at the same *restaurant* as the jurors (being the only full restaurant in the Village of Benton wherein the Bossier Parish Courthouse is located), it strains propriety for the witnesses to eat at the same

*table* with the triers of fact. Conceding, arguendo, that they confined their discussions to innocuous matters, the fact remains that the issue of guilt in the case at bar depended upon the credibility of Lt. Bolton. The lieutenant had testified that he removed the matchbox from the defendant's trouser pocket (where, obviously, it would be difficult for someone to plant evidence without the knowledge of defendant). Defendant, Dan Dotson, on the other hand, had testified that Lt. Bolton removed the matchbox from his coat pocket (where, concededly, it would be easier for someone to plant evidence without the knowledge of defendant). The success of defendant's claim that he had been framed thus depended in large measure upon whether the jurors chose to believe Lt. Bolton's account, that the marijuana was found in defendant's left trouser pocket, or whether the jurors chose to believe defendant Dan Dotson's story, that the marijuana had been planted in his coat pocket (which coat he claimed he had taken off and put on intermittently at various times during the day on the day of his arrest).

The credibility of Lt. Bolton thus was squarely in issue. Eating together allows the witness and the juror to establish a close relationship at a time when the juror should remain impartial. Such close association of a key prosecution witness with a juror should not be permitted.

Said the United States Supreme Court in the case of Turner v. Louisiana:

"The two principal witnesses for the prosecution at the trial were Vincent Rispone and Hulon Simmons. Both were deputy sheriffs of Tangipahoa Parish. * * *

"The members of the jury were sequestered in accordance with Louisiana law during the course of the trial, and were 'placed in charge of the Sheriff' by the trial judge. In practice, this meant that the jurors were continuously in the company of deputy sheriffs of Tangipahoa Parish during the three days that the trial lasted. The deputies drove the jurors to a restaurant for each meal, and to their lodgings each night. The deputies ate with them, conversed with them, and did errands for them.

"Two of the deputy sheriffs who were in this close and continual association with the jurors were Vincent Rispone and Hulon Simmons. Turner's counsel moved for a mistrial when Rispone testified as a witness for the prosecution, and made the same motion when Simmons testified. * * *

"While thus casting its judgment in terms of state law, the [Louisiana] court's affirmance of Turner's conviction necessarily rejected his claim that the conduct of the trial had violated the Fourteenth Amendment. We hold oth-

erwise with respect to the federal constitutional issue, and accordingly reverse the judgment before us.

" * * * It would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were *not* deputy sheriffs. But the role that Simmons and Rispone played as deputies made the association even more prejudicial * * * And Turner's fate depended upon how much confidence the jury placed in these two witnesses." Turner v. Louisiana, 379 U.S. 466, 467, 468, 470, 474, 85 S.Ct. 546, 547, 548, 549, 550, 13 L.Ed.2d 424 (1965) (emphasis in original) (footnotes omitted).

We do not intend, by our decision in this case, to extend the ruling in Turner v. Louisiana to require reversal because of fortuitous and casual encounters between witnesses and jurors. However, because the facilities available in Benton are limited, the court there should guard against a recurrence. Bill of Exception No. 5 is sustained.

For the reasons assigned, the verdict and sentence are set aside, and this case is remanded for a new trial.

BARHAM, J., concurs in result.

SANDERS and SUMMERS, JJ., dissent.

HAMLIN, Justice (dissenting).

It is my view that the ruling on Bill of Exceptions No. 2 is going to open the door to compel disclosure of the identity of an informer every time defense counsel makes a statement that his client was framed, without offering any proof or circumstance in support of such statement, as counsel has done in this case. The statement in State v. Pagnotta, 253 La. 770, 220 So.2d 69, that "there is no allegation by the defendant through his counsel or through any testimony that the confidential agent had framed him * * *" was not intended to open the door for disclosure of an informer's identity as the majority opinion has ruled. Nor do I believe that the facts in the case of Roviaro v. United States, 353 U.S. 53, 59–61, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), are apposite to the circumstances of the instant case. I find no merit in this bill.

As to the ruling of the majority opinion on Bill of Exceptions No. 3, it is clear to me that this ruling addresses itself to the weight and sufficiency of the evidence. Evidence was heard, argument was made, and the jury was charged as to the law; the jury then returned its verdict, after having weighed the law and the evidence. The jury concluded that the evidence was sufficient. I find no merit in this bill.

The ruling of the majority opinion with respect to Bill of Exceptions No. 4 ap-

pears to be based upon the language used by the State rather than the real purpose of the evidence. It is admitted in the majority opinion that evidence of prior possession is admissible for the purpose of showing guilty knowledge or intent. The ruling herein is highly technical, and I do not think that the State should be penalized because of some thoughtless, erroneous, harmless, language employed by the District Attorney during the tenseness of trial. I find no merit in this bill.

Bill of Exceptions No. 5 has been disposed of by citing Turner v. Louisiana, 379 U.S. 466, 467, 468, 470, 474, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965). The facts in Turner and in the instant case are not similar. As I read the majority opinion, the reason for the ruling on this bill was because "it strains propriety for the witnesses to eat at the same table with the triers of fact" in this small restaurant. In short, it is based upon an opinion as to what constitutes propriety. This is a reflection on the integrity of the parties seated at the table; their lack of integrity is not borne out by the record. On the contrary, it is presumed that the officers and jurors, who were under oath, would do their duty.

I am further of the opinion that the accused received a fair trial, and that the errors set forth in the majority opinion were not such as is provided for in Art. 921, C.Cr.P., which reads as follows:

"Art. 921. Matters not grounds for reversal

"A judgment or ruling shall not be reversed by an appellate court on any ground unless in the opinion of the court after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, is prejudicial to the substantial rights of the accused, or constitutes a substantial violation of a constitutional or statutory right."

There was no miscarriage of justice in this case; the *substantial* rights of the accused were not prejudiced, and there was no violation of a constitutional or statutory right.

I believe that herein the rights of the public have been put behind exaggerated judicial concern over the rights of the accused. It is difficult for people to understand why a defendant, found unchallengeably guilty by a jury, should be pampered because of some inconsequential error which did not diminish by any common standard the fairness of his trial.

The true test under Art. 921, C.Cr.P., supra, is and should be: Not the legal technicalities involved, but whether the rules have denied the defendant a fair trial. As above stated, I believe the defendant had a fair trial.

I am reluctant to adopt a technical ruling in favor of a guilty defendant unless there

is a previous ruling that fits the case under consideration like a glove. I do not find that such exists here; I do not desire to contribute to the devastating effect of technical decisions on the enforcement of criminal justice in this state and nation.

I believe that the United States Supreme Court is realizing the devastating effect of its recent decisions on the enforcement of criminal justice, because, in Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213, decided by that Court on December 15, 1970, it had this to say:

> "Almost 40 years ago, in Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674, Mr. Justice Cardozo wrote an opinion for this Court refusing to set aside a state criminal conviction because of the claimed denial of the right of confrontation. The closing words of that opinion are worth repeating here:
>
> > "'There is danger that the criminal law will be brought into contempt— that discredit will even touch the great immunities assured by the Fourteenth Amendment—*if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free.*' 291 U.S. 122, 54 S.Ct. 338."

In order to be sure about what Justice Cardozo meant by the use of the word "gossamer" I looked it up in the dictionary and found that it has two meanings, as follows:

1. A film of cobwebs floating in the air in calm clear weather.

2. Any gauzelike fabric.

I respectfully dissent.

## ON REHEARING

SANDERS, Justice.

We granted a rehearing in this criminal prosecution because of the State's forceful allegations that our decision was erroneous and, as grounded, would seriously hamper law enforcement. On rehearing, the district attorneys throughout the State joined in a scholarly brief seeking modification of the holding that requires disclosure of the identity of the confidential informant.

The facts may be briefly summarized. On November 22, 1969, Lt. O. G. Bolton of the Bossier City Police Department received a telephone call from a confidential informant, known to be reliable, that the occupants of a green automobile traveling from Shreveport to Bossier City possessed narcotics.

Lt. Bolton proceeded to the Shreveport-Barksdale Bridge, on the travel route, and called for additional police vehicles. When the automobile crossed the bridge, Lt. Bolton and other officers stopped the car and

arrested Dan E. Dotson, the defendant, and the driver for the possession of narcotics.

Lt. Bolton took Dotson and the driver to the Bossier City Police Headquarters. Another officer brought the automobile to the headquarters.

With the consent of the driver, the police searched the automobile but found no narcotics. The driver, however, was booked with having a defective muffler on his vehicle.

Lt. Bolton asked Dotson whether he would consent to a search of his person. The defendant, however, refused to give his consent. The officers then secured a search warrant from the judge of the City Court of Bossier City. Lt. Bolton then searched the clothing of defendant and seized a matchbox allegedly containing marijuana.

On original hearing, we upheld the trial court's ruling rejecting the motion to suppress the evidence taken from defendant's person. We reaffirm that ruling.

We reversed the conviction on the following grounds:

1. Failure of the court to require Lt. Bolton, the arresting officer, to disclose the name of the confidential informant. (Bill of Exceptions No. 2).

2. The erroneous admission into evidence of the matchbox and the substances contained in it. (Bill of Exceptions No. 3).

3. The admission in evidence of Lt. Bolton's testimony "that he had arrested defendant for possession of marijuana on a previous occasion." (Bill of Exceptions No. 4).

4. Communication of a juror with the State's witness Lt. Bolton as they sat at the same restaurant table for lunch. (Bill of Exceptions No. 5).

The legal questions surrounding each of these holdings are complicated and difficult. In order to give these questions adequate treatment, we reconsider the bills of exceptions seriatim.

## BILL OF EXCEPTIONS NO. 2:

### *Disclosure of the Identity of the Confidential Informant.*

At the trial, the State called Lt. O. G. Bolton of the Bossier City Police Department as its first witness. He testified to the receipt of the telephone call from the confidential informant, the arrest of defendant Dotson, and the seizure of the matchbox containing marijuana from his trousers pocket.

During the early stages of cross-examination, defense counsel asked the law enforcement officer the name of the confidential informant. When the officer withheld the name, defense counsel requested the court

to instruct the witness to answer the question, stating in part:

"The defendant will allege that the stuff that was found on him, marijuana, was planted there by the informant. And as a direct part of his defense, it will be necessary to place this informer on the stand and attack his credibility and attack whether or not he did, in fact, plant the stuff on him. I think this is an exception to the disclosure rule."

The trial judge declined to order the disclosure of the informant's name. The defendant reserved a bill of exceptions, and the trial proceeded. The State completed its case. The defense began the introduction of its evidence. It called as witnesses Luther Dotson, defendant's father; the defendant; Lamar Graham, the driver of the vehicle; and Phil Sage, a friend of the defendant. The gist of defendant's testimony was that the officers took the marijuana from his coat pocket, rather than his pants pocket as they had testified, that he had never seen the matchbox before, and that he did not know where the box came from.

Near the end of the defense testimony, defendant called Lt. Bolton as his own witness. Once again, he asked for the name of the confidential informant. The District Attorney objected. At this time, defense counsel made the following argument to the court:

"If it please the court Your Honor, I originally asked for the informers name.

At that time the court may have had reason to enforce the rule that you do not disclose the informers name. However, we have presented a defense in which we have alleged that this match box was not on Danny Dotson intentionally. That he did not know how it got there. And there is really only two possibilities. Either Lt. Bolton put it in his pocket and he drew it out or the informer put it in his pocket and called Lt. Bolton up on the telephone and told him he had it. Therefore, I think it is directly related to the defense in this case."

The District Attorney replied:

"If the court please, I must respectfully contradict counsel's assertion, that there has been any evidence from the mouth of any witness even indicating that an informant placed anything upon the person of this man. If the court will recall, in the defendant's own testimony, was that he had no idea where it came from. That he was with certain people. But that he had no idea where the material came from."

The court sustained the objection and again refused to order the disclosure of the informant's name. The defendant again reserved a bill of exceptions. Apparently, this bill has been combined with the first in formal Bill of Exceptions No. 2.

■ The informer privilege is the privilege of withholding the identity of an

informant who supplies information to law enforcement officials concerning crime. The privilege is founded upon public policy and seeks to advance the public interest in effective law enforcement. Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151 (1938); 21 Am.Jur.2d, Criminal Law, § 332, pp. 359–360; Gutterman, The Informer Privilege, 58 J.Crim.L.C. & Pol.S. 32.

■ Because of its social importance, courts zealously guard the privilege. They order disclosure of the name of a confidential informant only under exceptional circumstances for the prevention of an injustice. The burden is upon the defendant to show exceptional circumstances justifying disclosure. State v. Greenbaum, 257 La. 917, 244 So.2d 832; State v. Boles, 246 N.C. 83, 97 S.E.2d 476; State v. Driscoll, 61 Wash.2d 533, 379 P.2d 206; 21 Am.Jur.2d, Criminal Law, § 332, p. 360. On the question of whether the circumstances warrant disclosure, much discretion is vested in the trial court. Durham v. United States, 403 F.2d 190 (9th Cir. 1968); Anno: Accused's Rights-Informer-Identity, 76 A.L.R.2d 262, 279.

■ Although no fixed rule exists, the court-ordered disclosures relate to instances in which the prosecution's case shows that the informer, cooperating with the police, participated in the crime. When the prosecution's case shows that the informer participated in the crime, the informer's identity should be disclosed to the defendant. In such cases, the informer does more than furnish a tip that enables the police to make an arrest. While working with the police, he takes part in the illegal transaction itself. See Roviaro v. United States, supra; United States v. Barnett, 418 F.2d 309 (6th Cir. 1969); United States v. Lloyd, 400 F.2d 414 (6th Cir. 1968); Portomene v. United States, 221 F.2d 582 (5th Cir. 1955); Lopez-Hernandez v. United States, 394 F.2d 820 (9th Cir. 1968); Sorrentino v. United States, 163 F.2d 627 (9th Cir. 1947).

■ In reversing the trial court and ordering disclosure, this Court relied primarily on Roviaro v. United States, supra.[1] In Roviaro v. United States, the petitioner was arrested after the law enforcement officers had overheard him negotiating a sale of narcotics to a government informer and observed him transfer the narcotics to the informer. The indictment charged him with the sale of heroin to "John Doe", the informer, as well as the fruadulent and knowing transportation of the narcotic after illegal importation. The prosecution's evidence covered the transaction with the

---

1. The majority opinion also cited *dicta* from our decision in State v. Pagnotta, 253 La. 770, 220 So.2d 69 (1969). As pointed out by Mr. Justice Hamlin in his dissent, the language relied upon establishes no rule that an allegation of a "frame" is sufficient of itself to require disclosure of an informer's name.

informer. Over defense objection, the name of the informer was withheld.

In setting aside the conviction, the United States Supreme Court said:

"Three recent cases in the Courts of Appeals have involved the identical problem raised here—the Government's right to withhold the identity of an informer who helped to set up the commission of the crime and who was present at its occurrence. Portomene v. United States, 5 Cir., 221 F.2d 582; United States v. Conforti, 7 Cir., 200 F.2d 365; Sorrentino v. United States, 9 Cir., 163 F.2d 627. In each case it was stated that the identity of such an informer must be disclosed whenever the informer's testimony may be relevant and helpful to the accused's defense.

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

.　　.　　.　　.　　.　　.

"This is a case where the Government's informer was the sole participant, other than the accused, in the transaction charged. The informer was the only witness in a position to amplify or contradict the testimony of government witnesses. Moreover, a government witness testified that Doe denied knowing petitioner or ever having seen him before. We conclude that, under these circumstances, the trial court committed prejudicial error in permitting the Government to withhold the identity of its undercover employee in the face of repeated demands by the accused for his disclosure." (Footnotes omitted).

We now think we erred in applying Roviaro v. United States to the present case, as a decision directly in point. Unlike *Roviaro*, the prosecution's evidence here does not show that the informer set up and participated in the crime as an aid to the law enforcement officers or otherwise.

It is true that defendant denied any knowledge of the marijuana. It is also true that a conflict arose in the testimony as to whether the marijuana was found in defendant's "very tight" front pants pocket or in his coat pocket.

The State's witnesses, Lt. Bolton and Sgt. Almond, testified that they found the marijuana in defendant's pants pocket. Their testimony was corroborated by Officer Seaton, a defense witness.

The main theme of defendant's testimony was that the marijuana was in his coat

pocket, and he didn't know how it got there. Graham, the automobile driver, also testified that the marijuana was taken from the coat pocket.

In his *Per Curiam*, the trial judge states:

"There must be some act shown, something more than speculation concerning frame or plant, before an informant's identity should be revealed. Since there was no such showing in this case, the defendant is not entitled to this information."

The trial judge obviously found the defense theory, that the informer placed the marijuana in defendant's coat pocket, lacked evidentiary support.

The closest case in point is Jones v. United States, 326 F.2d 124 (9th Cir. 1963.) In that case, a United States Customs Agent stopped Jones' car after being told by an informer that two individuals in a 1956 red and white Buick, bearing California license number MXW707, had arranged to obtain a package of marijuana and would probably attempt to bring it into the United States. After Jones' arrest, marijuana was found in the trunk of his car. At the trial, Jones and his co-defendant requested the court to order disclosure of the informer's name, asserting that they knew nothing about the marijuana and that someone had framed them in order to collect the government reward. The defendants put on evidence in an attempt to show

how bulk marijuana was placed in the locked rear compartment of Jones' car by some unknown third person.

The United States Court of Appeals denied disclosure of the informer's identity, quoting the trial court's decision as follows:

"As was said in the case of Roviaro v. United States, 353 U.S. 53 [77 S.Ct. 623, 1 L.Ed.2d 639], there is no fixed rule with respect to disclosure of the name of the informer. The problem is one which calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense.

"In the case before us, the Government evidently intended to present its case without mention of the information which led to searching the car. It was only when it appeared likely that the search was illegal that the prosecution brought out evidence as to probable cause. Here, we are not dealing with evidence regarding an informer whom the Government puts forth as an actual participant in a crime. . . .

"In weighing the evidence adduced at the hearing on the motions, it seems quite probable that Jones himself, placed the marijuana in the car and that the name of the informer is not essential to his defense. It appears more likely that the name is sought in an effort to force a dismissal of the case, since the Govern-

ment announced it would not, under any conditions disclose the identity of the informer.

"Following the test laid down in Roviaro v. United States, we are of the opinion that defendants' request should be denied."

■■ In the light of the evidence, the trial judge was fully justified in finding that the showing was inadequate to require disclosure of the name. If a bare suggestion that the informer framed the defendant could effect a disclosure of the informer's name, then the enforcement of our narcotics laws would be jeopardized. Effective law enforcement requires that the confidentiality of the names of crime-informers be safeguarded. In supplying information to a defendant in a criminal proceeding, this Court cannot sacrifice fairness to the public. Neither can it ignore the public's interest in effective law enforcement.

We conclude that the bill of exceptions lacks merit.

### BILL OF EXCEPTIONS NO. 3:

*The Admission of the Matchbox of Marijuana in Evidence.*

Over defense objection that the foundation was insufficient, the trial court admitted in evidence a matchbox, allegedly containing marijuana. The question raised by the bill of exceptions is whether the foundation was adequate for the admission of the evidence.

■ To admit demonstrative evidence at a trial, the law requires that the object be identified. The identification can be visual, that is, by testimony at the trial that the object exhibited is the one related to the case. It can also be identified by chain of custody, that is, by establishing the custody of the object from the time it was seized to the time it is offered in evidence.

■ The law does not require that the evidence as to custody eliminate all possibility that the object has been altered. For admission, it suffices if the custodial evidence establishes that it is more probable than not that the object is the one connected with the case. A preponderance of the evidence is sufficient. State v. Coleman, 254 La. 264, 223 So.2d 402; State v. Martin, 250 La. 705, 198 So.2d 897; State v. Bertrand, 247 La. 232, 170 So.2d 386.

■ The lack of positive identification goes to the weight of the evidence, rather than to its admissibility. Ultimately, connexity of physical evidence is a factual matter for determination by the jury. State v. Wright, 254 La. 521, 225 So.2d 201; State v. Whitfield, 253 La. 679, 219 So.2d 493; State v. Progue, 243 La. 337, 144 So.2d 352; 2 Wharton's Criminal Evidence (12th ed.), § 673, p. 617.

The record reflects that a small Red Ball Safety Match box, containing vegetable material and several small tablets, was taken from defendant's pants pocket. Sgt. David M. Almond of the Bossier City Police Department, present at the search, took possession of the box. On the same day, he photographed the box and its contents. The photograph was admitted in evidence without objection by the defense.[2] Sgt. Almond placed the box in a locked evidence room of the Police Department. Sgt. Almond kept the key. Two days later, Sgt. Almond withdrew the box and carried it to the Louisiana State Crime Laboratory in Baton Rouge. There, he delivered the box to Ray Herd, Supervisor of the State Crime Laboratory. Mr. Herd wrote on the box the laboratory number, SP–7397–69. He then gave the Sergeant a receipt bearing the laboratory number and containing a brief description of the box and contents. Both Mr. Herd and Sgt. Almond signed the receipt. This receipt was admitted in evidence without objection.[3]

At the State Crime Laboratory, the standard procedure is to place the laboratory item in an evidence locker under lock and key. It is withdrawn only by criminologists in the laboratory for testing.

The first criminologist who tested the contents made a written report. On the day of trial, Mr. Herd assigned the numbered box to a second criminologist, Paul L. Cobb, Jr., for testing. Mr. Cobb tested the vegetable material and found it to be marijuana. Bringing the box and the written report of the first criminologist, he then appeared at the trial. He identified the box as the same one delivered to him by Supervisor Herd and identified the number on it as the laboratory number. Although he referred in his testimony to the written report of the first criminologist, that report was not offered in evidence.

 The question presented is whether the State's failure to produce the testimony of Supervisor Ray Herd and the other criminologist rendered the foundation fatally defective and the matchbox, containing the vegetable material, inadmissible at the trial. After reconsideration, we think it does not.

The photograph of the matchbox and its contents is in evidence. The crime laboratory receipt signed by Ray Herd, Supervisor of the State Crime Laboratory, and Sgt. Almond is also in evidence. The disputed matchbox bears number SP–7397–69. The number adequately identifies it for admission purposes as the same box delivered to the laboratory by Sgt. Almond.

It is true a possibility exists that one of the criminologists at the laboratory changed the material in the box when it was tested. The law, however, does not require the

2. Tr. 90; S–1, Tr. 34.

3. Tr. 91–92; S–2, Tr. 35.

foundation to negate every possibility of tampering.

In State v. Coleman, supra, the nurse who stored a *marked* vial of blood was not called to testify. In sustaining the admission of the vial, this Court stated:

"Since a question of fact is presented here, and we have invariably accorded a wide discretion to the fact-finder in such matters, we will not upset this conviction. Our decision is predicated upon the chain of circumstances established by the State's evidence in its effort to show continuous custody, control and supervision and, particularly, upon the expert opinion of Dr. Butler, supported by his long experience, that the blood in the vial had not been tampered with. The law makes no requirement that the proof be absolute or positive. A clear preponderance of the evidence on a question of admissibility is sufficient. This requirement is satisfied here."

▬▬ In the present case, in addition to the testimony concerning the chain of possession, the trial judge had before him an admittedly genuine photograph of the matchbox and vegetable material taken from defendant. With the photograph, the evidence still falls short of positive identification. The lack of positive identification, however, goes to the weight of the evidence, rather than its admissibility. In our opinion, the foundation is adequate for the admission of the evidence.

## BILL OF EXCEPTIONS NO. 4:

### *Evidence of Prior Arrest.*

During cross-examination of defendant Dotson, the District Attorney asked him if he had used marijuana on previous occasions. He replied that he had not.

Later, the District Attorney asked him the location of a certain residence. Defense counsel objected to this question. The District Attorney announced that the question was intended to serve as a basis for rebuttal evidence that defendant had in fact used marijuana.

In response to a question of defense counsel, the District Attorney stated he had no intention of introducing evidence of a prior arrest or conviction.

The trial judge overruled the objection, the cross-examination was pursued, and the defendant persisted in his testimony that he had never used marijuana before.

Lt. O. G. Bolton was later called as a defense witness. On cross-examination, the District Attorney propounded a question and received an answer as follows:

"Q. On the 22nd of November. He has testified you have had previous contact with him. Is this correct?

"A. Yes sir I have. When I arrested him—"

The defendant objected. Whereupon, the District Attorney announced that he was not trying to show a prior arrest. With

this assurance, he was allowed to resume cross-examination and produce testimony tending to show that defendant had previously used marijuana.

Defense counsel moved for a mistrial, but it was denied. He later perfected the following Bill of Exceptions:

"Defense counsel objected to the State asking questions to the defendant concerning prior arrest and made a part hereof is the trial transcript, pages 86, 88 and 90. Also defendant objected to police officer Buddy Bolton testifying concerning prior arrest on pages 119 and 121 and a mistrial was requested on pages 120–121 of the transcript which motions were overruled and defendant then and there excepted."

On original hearing, we held that Lt. Bolton's testimony that he had arrested defendant for possession of marijuana on a previous occasion was reversible error. In so holding, we now think we erred.

On rehearing the State asserts that Lt. Bolton's mention of arrest ("When I arrested him—") refers to the arrest for the present offense on November 22, 1969. The defense, on the other hand, asserts that it refers to a prior arrest. The fragmentary sentence is ambiguous. We find it unnecesary, however, to resolve the conflict.

■ The record reflects that the testimony of Lt. Bolton referring to the arrest came after the District Attorney had announced that he would offer no testimony of a prior arrest or conviction. It was unresponsive to the question directed to the officer. The question was whether he had any previous contact with defendant. The question merely called for an affirmance or denial of prior contact, already referred to by the defendant while under redirect examination by his own counsel. The reference to arrest was unsolicited.

■ It is well established that unsolicited and unresponsive testimony cannot be charged against the State to provide a ground for reversal. State v. Sinclair, 258 La. 84, 245 So.2d 365; State v. Callihan, 257 La. 298, 242 So.2d 521; State v. Arena, 254 La. 358, 223 So.2d 832; State v. Simpson, 216 La. 212, 43 So.2d 585, cert. denied 339 U.S. 929, 70 S.Ct. 625, 94 L.Ed. 1350.

This rule has greater force in the present case, since the witness who volunteered the information was testifying as a defense witness. Hence, the witness's reference to an arrest is not reversible error.

■ The evidence tending to show that defendant had previously used marijuana was admissible. Although the prior conduct was criminal, it had an independent relevance to guilty knowledge, an essential element of the crime charged. LSA–R.S. 15:445, 446; State v. Harris, 232 La. 911, 95 So.2d 496; State v. Wagner, 229 La. 223, 85 So.2d 272; Comment, Admissibility of

Evidence of Prior Arrests in Louisiana Criminal Trials, 19 La.L.Rev. 684, 690. On the issue of guilty knowledge or intent, the defendant denied prior use of marijuana. Hence, the State had the right to contradict this testimony. At the trial, as noted in the original opinion, the District Attorney referred to the testimony as "impeaching." The term *impeaching* is a misnomer. Technically, the testimony should be designated as rebutting or contradicting. In State v. Monroe, 205 La. 285, 17 So.2d 331, we stated:

"Rebutting evidence is that which is offered to explain, repel, counteract or disprove facts given in evidence by the adverse party. State v. Hemler, 157 La. 902, 103 So. 257.

"It is rebuttal, not impeaching, to show that the statement of the witnesses as to what occurred is not true. State v. Foster, 150 La. 971, 91 So. 411. And contradiction is one of the means of rebutting the testimony of a witness produced by the defendant in a criminal prosecution as the State can not contradict the testimony of a witness for the defendant until the testimony is offered in defendant's behalf on the trial of the case. State v. Blount, 124 La. 202, 50 So. 12."

See also State v. Poe, 214 La. 606, 38 So. 2d 359 (on rehearing); Marr's Criminal Jurisprudence of Louisiana, § 633, pp. 966–967 (1923).

The evidence of prior use of marijuana was properly admitted to rebut or contradict the defendant's testimony on an essential issue. We discern no error in the rulings of the trial judge.

The bill of exceptions lacks merit.

## BILL OF EXCEPTIONS NO. 5:

### *Contact of Juror with Lt. Bolton.*

As authorized by Article 791 of the Louisiana Code of Criminal Procedure, the jury in the present case was unsequestered prior to the court's charge. During the noon recess, the court released the jurors to get lunch. After the recess, defense counsel moved for a mistrial on the ground that one of the jurors had communicated with Lt. Bolton, a state witness, during lunch.[4] To support the motion, defense counsel testified. He related that he observed the juror seated at the same table with Lt. Bolton and two other persons during lunch. As they dined, the four conversed among themselves. In response to questions from the court, defense counsel declined to charge that the diners had discussed the case.

4. The trial judge had admonished the jurors not to discuss the case with anyone. He had placed the witnesses under rule and instructed them not to discuss the case with anyone except the District Attorney or defense counsel. See LSA–C. Cr.P. Art. 764.

The District Attorney then sought to call the juror to explain the incident. Defense counsel objected, and the court sustained the objection.

In appraising the situation, the trial judge commented:

"The court is aware of the fact that we have in this community, very limited facilities for lunches, as you know. We have just the one small restaurant. And the jury has not been sequestered at this time. Now unless there is some evidence of some improper communication to the jury, I can't see that I can entertain your motion for a mistrial."

The trial judge overruled the motion for a mistrial.

In Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424, the United States Supreme Court reversed a state conviction because of the "close and continual association" of two major state witnesses with the jury in their charge. The Supreme Court held:

"The two principal witnesses for the prosecution at the trial were Vincent Rispone and Hulon Simmons. Both were deputy sheriffs of Tangipahoa Parish.

. . .

"The members of the jury were sequestered in accordance with Louisiana law during the course of the trial, and were 'placed in charge of the Sheriff' by the trial judge. In practice, this meant that the jurors were continuously in the company of deputy sheriffs of Tangipahoa Parish during the three days that the trial lasted. The deputies drove the jurors to a restaurant for each meal, and to their lodgings each night. The deputies ate with them, conversed with them, and did errands for them.

"Two of the deputy sheriffs who were in this close and continual association with the jurors were Vincent Rispone and Hulon Simmons. Turner's counsel moved for a mistrial when Rispone testified as a witness for the prosecution, and made the same motion when Simmons testified.

. . .

"It would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were *not* deputy sheriffs. But the role that Simmons and Rispone played as deputies made the association even more prejudicial. For the relationship was one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial. And Turner's fate depended upon how much confidence the jury placed in these two witnesses." (Footnotes omitted).

There, the jury was sequestered. The two principal state witnesses, both deputy sheriffs, were placed in charge of the jury. For three days, these deputies had close and

continual association with the jurors, eating with them, conversing with them, and doing errands for them. The case deals with the constitutional problems raised when a prosecution witness has charge of a sequestered jury.

▬ That decision is inapplicable to casual communications between a prosecution witness and an unsequestered juror. In such a situation, other principles come into operation. The majority rule is that communication between a juror and a witness in a criminal trial without a showing that the defendant was prejudiced furnishes no ground for upsetting a conviction. State v. Nails, 255 La. 1070, 234 So.2d 184; State v. Johnson, 149 La. 922, 90 So. 257; States v. Miles (Mo.), 364 S.W.2d 532, 9 A.L.R.3d 1266; Annot., Jurors-Communications with Witnesses, 9 A.L.R.3d 1275, 1280–1282.

In State v. Johnson, supra, this Court aligned itself with the majority rule and upheld the conviction after a juror had eaten lunch with a State witness. The Court found no prejudice, holding:

"Defendant also alleges in his motion for a new trial that the said juror Chapman, on the second day of the trial, left the courthouse arm in arm with one Ware, who appeared as a witness for the prosecution, and who was very active against defendant in the trial of the case, and that the said Ware and the said Chapman were in close conversation as they left the courthouse, and went together to the Cosmopolitan restaurant, in the city of Shreveport, and to a secluded part of the restaurant.

"Defendant called A. N. Adcock, H. I. Moore, and Guy Armstrong on this part of the case as witnesses. Neither of these witnesses testified to anything that was said by Ware and Chapman to each other. They merely saw them together, and in conversation, which was proven by Chapman and Ware to be about Chapman's fast driving to get to court in time. It is established beyond dispute that Chapman and Ware went to the restaurant accompanied by Barry and Linsey, all of whom dined together, and not one word was said about the case against Johnson. As these four men lived at Mooringsport and were acquainted with each other, is was a very natural thing for them to dine together. There was nothing suspicious about it."

▬ In the present case, the testimony establishes only a conversation among four people, including the juror, seated at a restaurant table. There is no showing that the juror or other diners discussed the case.

In his *Per Curiam*, the trial judge states:

"The jury had not yet been sequestered and defendant did not charge that the witness had discussed the case with the juror or had sought to influence him in any manner. The mere fact that the wit-

ness and the juror ate lunch at the same table in the only restaurant in Benton is not grounds for a mistrial."

 The ruling of the trial judge as to the misconduct of a juror is entitled to great weight. See State v. Fike, 129 La. 663, 56 So. 630; Marr's Criminal Jurisprudence of Louisiana, § 467 p. 714 (1923).

 Under the circumstances, this Court cannot presume prejudice. See LSA–C.Cr.P. Art. 921; State v. Nails, supra. While innocent contact of a juror with a witness is to be avoided, when such contact does occur it does not always vitiate the conviction. In our opinion, the trial judge correctly denied the mistrial. The conviction should stand.

For the reasons assigned, the conviction and sentence are affirmed.

TATE, J., dissents for the reasons assigned in our original opinion.

DIXON, J., dissents for the reasons expressed in our original opinion.

BARHAM, Justice (dissenting).

I am of the opinion that Bill of Exceptions No. 5 presents reversible error, and I pretermit a discussion of the other bills.

The majority attempts to distinguish Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424, by finding that in the Turner case "the jury was sequestered".

This distinction has no validity. Physical sequestration of a jury is only one method for insuring that jurors are not tampered with, do not discuss the case, and are not subjected to outside influence, so that they may reach their verdict, as said in Turner, "upon the evidence developed at the trial". All courts in this state, before permitting jurors to separate or even to leave the courtroom as a group, admonish them not to discuss the case, form any opinion, or read or listen to anything about the case. The redactors of the Code of Criminal Procedure, according to the comment under Article 791, found it unnecessary in the face of this uniform practice even to include a procedural guide for such instructions. Whether the jurors separate or whether they are physically sequestered, the standard of conduct of others toward them and of the jurors toward others is the same.

In Turner it was the close association between the jurors and two deputy sheriffs who were key prosecution witnesses which was found to be constitutionally impermissible. The United States Supreme Court pointed out that this association during the period of the trial could not but foster the jurors' confidence in these two men not only as keepers but also as witnesses. Here, just before the case was submitted to the jury, just before argument by counsel and the judge's charge, Lieutenant Bolton, the principal State's witness, lunched with a

juror. There is no need to establish what they discussed or whether they discussed the case. Bolton's association with the juror "could not but foster" that juror's confidence in him as a witness in the trial. In my opinion the association here was of the same nature as that which the Supreme Court said in Turner "undermined the basic guarantees of trial by jury." The conviction and sentence should be reversed.

I respectfully dissent.